Wednesday, February 14th, 1816, the Judges pronounced their opinions.
Judge Coalter.
William Lighifoot of Charles City, m the year 1807, intermarried with the female appellee, by whom he had two children.
Having taken up, very unjustly it would seem, an unfavourable opinion of his wife, and she having also displeased him by a refusal to relinquish her dow'er right in some lands, conveyed to one of his sons by a former marriage, he took advice how he might dispose of the greater part of his personal estate in favour of his other children by that marriage, so as to exclude his then wife and the children by her. At the time this design was conceived and carried into effect, so far as hereafter stated, he was in very bad health, in which situation he continued to languish for about two or three months, when he died.
The plan selected for this purpose was to execute a deed of trust, which was accordingly done, to his friend and relation. *44 William Allen, in substance as follows. After stating that his purpose in making said deed was to advance his sons and daughters by certain gift3 in his life time, which it should not be in Ms power to revoke, and to relieve his mind from the care and management of some parts of bis estate, he, in consideration thereof, and of the love of his said children, to wit, William H. Lightfoot, Philip J. Lightfoot, Mary E. B. Blakey, and Anne C. Lightfoot, and of one dollar, conveys to said Allen, his executors, administrators and assigns forever, all his "slaves, except seventy-five, to be selected as therein after mentioned, and all Ms other personal estate of whatever consisting, whether of piafe, specie, bullion, debts by bond, bill, note or open account cor,' tract, or otherwise, or of furniture, stocks of horses, cattle, sheep, hogs, or other things, upon the following trusts, conditions and exceptions, and to and upon no other:
1st. To suffer the said Lightfoot to hold and enjoy the said slaves and other personal estate, or such part thereof as he may choose, during his natural life, and if he shall think proper to part with any of said stock, he shall be at liberty to do so, and shall account with said Allen for any money arising from the sale thereof:
2d. To reserve out of the personal estate, so conveyed, so much as shall be necessary for the discharge and satisfaction of all his said Lightfoofs just debts :
3d. To reserve, also, out of said personal estate, so much as shall be sufficient to raise the sum of six thousand pounds; three thousand whereof are to be forthwith considered as vested in and belonging to said Mary E. B. Blakey, and the remaining three thousand are forthwith to be considered as vesled in and belonging to said Anne C Lightfoot: but it shall not be the duty of the said William Allen to pay the same to the said Mary E. Blakey, her husband or the said Anne C. Lightfoot, during the life of said William Lightfoot, until, in his full, free, and uncontrollable discretion, he shall think proper so to do: and if the said Anne C. Lightfoot shall depart this life before marriage, then the said three thousand pomids shall be divided equally among the surviving children of said Lightfoot by his first wife:
4th. To select the seventy-five slaves, reserved as aforesaid, in such manner as said William Lightfoot may prefer, and, if be makes no such preference, in such manner as said Allen shall *45 «boose, due regard being had to the proportionate qualities and values of all the slaves.
5th- To transfer and assign, and in the fullest manner convey, to said FJilliam H. Lightfoot, whensoever, according to the true intent and meaning of these presents, he may lawfully demand the same, a full moiety of said slaves, and other personal estate, as may belong to him, after the deductions, reservations and conditions aforesaid, and upon an equal division of the remaining parts between the said William H. Lightfoot and Philip J. Lightfoot.
6th, In like manner to transfer, &c. to Philip J. Lightfoot, whensoever he shall he capable in law if receiving the same, or to his guardian, whensoever, according to the true intent and meaning of these presents, he may lawfully demand the same, a full moiety of said slaves, &c.: but if the said Philip shall die before the age of twenty-one, without leaving, at his death, any child or children lawfully begotten, then his moiety, upon the division aforesaid, shall be equally divided among the surviving children by the first marriage.
7th. The grantor excepts out of the operation of said deed such property, as he had heretofore given to his children, and then concludes, that said Wm. Allen shall not he liable, hi any manner, to any loss, damage, or txpsn.ee in the execution of the trust, and that his accounts, divisions, selections of slaves, reservations, and actings shall stand Jinn and valid, without any CHARGE OF NEGLECT, &C.
This deed bears dale on the 21st of April, 1809. There are the names of three subscribing witnesses to it; it was recorded, however, in Charles’ city court on the 19th of May, 1809, on the proof of only two witnesses, John Willison and James Stuart, who stand first in the order of signing. ¡Stuart, in his deposition, says it was executed and attested by him on the 17th of May, 1809 ; at which time said Lightfoot was very unwell; and that 140 of his slaves were.brought to his bouse, valued by Wm. Allen, and divided between the two sons mentioned in said deed, but, not removed.
A few days after the date of this deed, to wit, on the 27th of April, 1809, the same Wm. Lightfoot made his will, wherein he says, “ having executed a deed for the greater part of my i! slavey and other personal estate to Wm. Allen, in trust, with *46 “ certain reservations, &c. I do hereby confirm to my several “ children therein named, by my first wife, and to my son in law “ Geo. Blakey, all the estate to them respectively thereby given, whe- “ ther of slaves, money, horses, or any other thing.” 2d. He gives to his wife her dower in his land, and her distributable share in the personal estate now remaining to him. 3d. To his children by her he gives $400 each, to be paid by his sons William and Philip out of the portions of his estate devised or bequeathed to them. He gives to his daughters, each, any two negro girls they may select out of his estate. He then devises a large real estate to his son Philip, and half his remaining slaves; and to his son William all the residue of his real and personal estate, and the one half of his remaining slaves, &c.; and constitutes William Allen, John Tyler and George Blakey executors of his will, and guardians of his son Philip and daughter Anne, and gives them power to make division and partition of the said estates according to the provisions of his said will, and that no security shall be required of them as executors.
On the 18th of May, he makes a deed to his son William, for the consideration of natural affection, and a small annual hire, for a number of slaves, part of the seventy-five reserved as above; and, also, about the same time, makes deeds to his son in law Blakey and his daughter Anne, for two negro girls each, which he says he had given them by his will. On the 8th of June, he makes a codicil to his will, giving to his son Philip seventeen slaves, by name, tobe of equal value to those given to William by deed, being part of the seventy-five reserved.
It appears that the personal estate of said Lightfoot exclusive of the 140 and 75 slaves ahove, was considerable, iu household furniture, horses, stock of all kinds, &c.; of which, it seems, Allen has sold, by consent, since this suit, to the amount of $11,385,00 — that said Allen has received into his possession the iron, chest and trunks of said Lightfoot, since his death containing his books of account, bonds and other evidences of credits, including loan office certificates, bank notes and cash, to the amount of upwards of 15,0001.: — in addition to which, there appears a credit of about 1250Í., on account Of tobacco sold by Lightfoot, after the deed of trust, to *47 one Whittle. The whole of which property, slaves, other personal estate, credits, &e. said Lightfoot kept in his own possession until his death, except that perhaps the two negro girls, given to Blakey, were delivered to him by said Jjightfoot, together with bonds on Fenwick to the amount of about 1448Z.
The female plaintiff brought her bill in equity against the executors, trustee, &c. for her distributive share of the slaves and other personal estate, and to have the deed of trust, and other deeds aforesaid, set aside and made void as to her, as fraudulent and illegal, and to have her dower in the land3 assigned her, &c.
in her amended bill, there is a vague allegation of a marriage promise, but, not considering it either sufficiently charged in the bill, or properly proved, I put it out of the case.
The important inquiry arises out of the deed of trust above mentioned; — how far it is to operate to bar her of her distributive share of the slaves and personal estate comprehended in it; and perhaps the same inquiry ought to be extended to the subsequent deeds of gift to the children of portions of the 75 slaves; — at least so far as those gifts were not consummated by delivery. I will, however, for the present, confine myself to the deed of trust.
In support of this claim, on the part of the appellees, it is alleged that the widow’s rights, under the laws of this state, are similar to those of a widow in England, under the custom of London; and that, therefore, the decisions of the British courts in cases arising under the custom, are entitled to as much respect and consideration as they usually receive here, when pronounced on cases arising under similar statutes with our own. We are referred to Black stone's Commentaries, and various other books as to the nature of the widow’s and orphan’s rights under the custom, and to numerous decisions of the Courts of Equity, in England, setting aside deeds of this kind as fraudulent. And I believe it will not be denied that, if the cases are parallel, and those decisions entitled to weight here, this case is stronger in favour of the appellees than many in which deeds there have been set aside.
Judge Blackstone, in the 2d voL of his Commentaries, pages 491 — 2 and 3, says, in substance, that the power of bequeath *48 ing personal estafe 13 co-eval with the first, rudiments of the law; but that we áre not to understand this power extended originally to all a man’s personal estate ; — on the contrary, that Glanville informs us, that, by the common Jaw, as it stood in the reign of Henry II., a man’s goods were to be divided into three equal parts, of which one went to his heirs, or lineal de« scendants, another to his wife, and the third at his own disposal; or if he died without a wife, he might dispose of a moiety, and the other went to his children; so, e converso, if he had no children, the wife was entitled to one moiety, and he might bequeath the otherthat the shares of the wife and children were called their reasonable parts, and the writ de rationabili parte bonornm was given to recover them, and which continued to be the law of the land at the time of Magna Charta: — that this, in the time of Edward III, was held to be the universal or common law, though frequently pleaded as the local custom of Berks, Devon, &c. ; and that Sir Henry Finch lays it down expressly in the time of Charles I., to be the general law of the land. This law, he adds, is at present altered by imperceptible degrees, and the deceased may now by will bequeath the whole of his goods and chattels, though we cannot trace when this alteration at first began. Again he says, This ancient method has continued in use in the province of York, — in. Wales and the city of London, ’til! very modem times, when, as to those places, it was changed by statute.
Agreeable to this ancient method, whether we consider it as being originally the common law, or merely the custom of particular places, the interest of the wife in the estate of tire husband, so far as it results from the aforesaid incapacity to bequeath the whole from her, was of the same nature as it always has been, and now is, under the laws of this stats : — indeed, at present, the extent of that interest in this respect is also the same, as will be seen by an inspection of our old and late statutes on the subject. I say, this I believe has always been the law here; for, although, about the 2áth of Charles II., when our first statute on the subject was made, doubts existed as to the widow’s rights, (probably owing to that change which Judge Blackstone says had taken place in En aland about that time, and perhaps for the want of a statute of distributions similar to that which a few years before had passed there,) yet the *49 legislature then interfered to do away those doubts. This act will be found in 2 Hen. Stat. at large, p. 303.
It recites that, “ whereas many doubts have arisen eoncern44 ing the estates of persons intestate, and of what parte thereof 44 ought to appertaine to the widdow, for the clearing whereof,” it is enacted, “ that where persons dye intestate, the wid- “ dow shall be endowed with the third part of the reall estate “ during life, and the third part of the persona.il estate, if there “ be but one or two children, but if there be any number of “ children more, in that case the personal! estate to be devided “ amongst the widdow and all the children share and share “ alike ; and, in case the husband make a will, that he hath it “ in his power to devise more to his wife than what is above de~ “ termined, but not lesse.”
Again, in our stat. of 4. Ann. ch. 23. (3d Hen. Stat. at large, 373,) which is nearly a transcript of the British statute of distributions of 22d and 23d Chas. II. ch. 10. instead of the clause in that statute which provides that nothing herein shall extend to or prejudice the custom of London and York, there is the following clause, “ provided, also, that, when any per- “ son dies testate, if he leaves one or two children, and no “ more, he shall not have power to dispose of more than two “ third parts of his estate, by will, to any other person or persons “ than his wife, and one third part thereof, at least, shall be given “ to her; and if such person shall leave more than two “ children, he. shall not leave his wife less than a child’s part, 44 according to the number of children : — but if such person “ leaves no child, then the wife shall have at least one equal “ moiety of his estate — it then provides, that any will, wherein a less part is left to the wife, shall upon her petition to the court where the same is recorded, be declared nail and void as to her, &c.
By the 1st of Geo. II. ch. 2. sect. 4. (Virg. laws, ed.of 1733, p. 407.) it is enacted, that, where a widow is not satisfied by the provision made for her in the will, she may renounce the same, either before the court, or by deed executed in presence of two witnesses, and may then demand and recover her dower in the slaves, and such share of the personal estate as by the above act is directed.
*50 Thus the law stood until 1785, when it was enacted, that a widow, dissatisfied with the provision made for her in the will, might renounce the same, in manner as above, and should then be entitled to one third of the slaves, for her life, and to the same portion of the personal estate as if her husband had died intestate, to wit, one moiety if no child, and one third if a child or children.
Here we find the same incapacity imposed on the husband, to bequeath all his personal estate from his wife, which existed in London under the custom ; and whether that was originally the common law, or whether it has always been the law of this state, seems to me not material to inquire into : — suffice it to say that similar incapacities and consequent rights existed under the custom that exist under our law, and we are called upon to weigh and determine the relevancy of decisions, in the British courts, in cases arising under the custom, to the one which has arisen here under our statute.
The case of Turner v. Jennings (a) is relied on as being very similar to the present, and though that case is as to the orphanage part, it applies as well to that of the widow ; the children, by the custom, having rights similar to those of the widow. In that case the freeman, by deed executed in his life time, grants and assigns the greater part of his personal estate, in trust for himself, for life, and then for the benefit of his grand children, his son dying in his life time. The plaintiff, who married the freeman’s daughter, brought his bill to set aside the deed, and to have his wife’s orphanage part, according to the custom : and though it was admitted, that if the father had made an actual gift of any part of his personal estate to his grand children, in his life time, or had actually given all to one child, that would have held good against the custom ; or if he had turned all his personal estate into a purchase of lands, he might have disposed of it as he thought fit; yet it was decreed for the plaintiff, and the deed set aside ; for that the freeman had not entirely dismissed himself of the estate in his life time ; and the deed being made when he mas languishing, and but a little before his death, it ought to be looked upon as a donatio causa mortis: the lord chancellor declaring that either the custom must be entirely given up, or this deed must be looked upon as made in fraud of (he custom.
*51 In Hall v. Hall (a) the Court say, if goods are absolutely given away by a freeman in his life time, this will stand good against the custom ; but if he has it in his power, as by keeping the deeds, &c. or if he retains the possession of the goods, or any part of them, this will be a fraud upon the custom.
In Smith v. Fellows, (b) the deed for a term of 99 years was made in trust to permit the grantor to take the rents and profits, during his life, then to assign the residue to his son, if of age, &c. — and if he should die before the grantor, to be a trust to the other children, &c. in exclusion of the widow, &c. A bill by the widow to set aside this deed was sustained. The cases of Turner v. Jennings, and Hall v. Hall were principally relied on.
In 1742 this decree is confirmed by the Lord Chancellor, (c) who declares it to be a plain fraud upon the custom.
In Thompkins v. Ladbrock, (d) a freeman of London, on the same day, executed a deed and a will; by the former of which, he assigns 5,000/., part of his personal estate, to trustees, to the separate use of his daughter, who had married without his consent, but with whom, and aiso with her husband, he had been reconciled ; but part of the trust of this deed was, that she should not have power to give it to her husband.
The father was indisposed at the time he made this gift, and died shortly after. The husband, in the life time of his wife, brought a bill to set aside this assignment. The first question which arose was, whether the husband, for his own benefit, had a right to call in question an act done by the father to defeat the custom, or whether that is confined to the child. ?
The second was whether this act was in fraud of the custom.
The Lord Chancellor decided both these points in the affirmative. To establish the first position, he speaks of the orphanage rights of the child, in the life time of the father, as inchoate rights to which her husband became entitled. That his rights were consequential, arising from the custom, contingent at first, but vested in him, in right of his wife, after the father’s death. Again, he says, “ The very custom supposes that this inchoate right (if I may so call it) of the child of a freeman, is a groundi of advancement of marriage, &c.”
*52 In establishing the second point, to wit, that this was a fraud on the custom, he considers it as an- act done by the father on his death bed, and no evidence of enjoyment or possession under it in the daughter, and therefore more in the nature of a testamentary act, and so void under the custom; and that in such cases there ought to be the clearest evidence of enjoyment under the grant; for this being not more than a third part of his estate, had she insisted on having the interest, during his life, he might have threatened to dispose of the testamentary part to her prejudice. In fact his opinion was that she would not be entitled to the interest during his life, it being a mere voluntary assignment of an equity, and passed no legal estate, and that the court would not decree it for her, if resisted, being merely voluntary, and nudum pactum; and though there- was na reservation of the use of this property to the grantor during his life, yet that is inferred to be his intention from the circumstance of his not delivering the securities, (from which, as I understand, the monies were to be received during his life;) and in this respect it was likened by the judge to the case of Hall v. Hall. But in the case before us, we are not left to infer the intention to keep possession of slaves, securities, and every thing, during his life, for it is expressly so stipulated in - the deed.
But it is said the wife is not a creditor, and has no rights against which a fraud can be committed. Might not the same, with equal propriety, be said of a husband before marriage ? His right to his intended wife’s property is only contingent and inchoate, depending on the subsequent marriage, w’hich may never take place; yet a fraud it is said may be committed against that right. (a) The property of the wife, nay even her contingent orphanage rights, under the custom, is a cause of advancement of, and consequently inducement to marriage, and why not the property of the husband 1 The husband may yield these his rights by a contract before marriage, and so also may the wife, by receiving a jointure : they are a subject of contract: so a child of a free man may compound or release to the father the orphanage part for'a proper consideration, and will be bound in equity by such contract. (f) The nature of these rights appears to me therefore to be very similar; as to those of the husband, they are recognized by our courts as an *53 interest against which a fraud may be committed; and as to those of the wife and children, if the common law was originally what judge Blackstone says it was, aud had so remained ’till this day, the decisions under the custom above referred to, and others, fully satisfy me that they too would have been recognized as rights against which fraud could be committed.
I do not think it material whether what is now called the custom was originally the common law, or not. It was a law of a considerable portion of the kingdom, and the reasons which induced a particular course of decision under it would have applied with the same force had it been and remained the general law. But take it as merely the law of part of the kingdom, and that, almost at the dawn of our existence, it was borrowed therefrom, by our legislature, as far as it respected the wife, and adopted as the general law of thi3 state, the rules and principles of decision, under the custom, if sound and correct equity, ought to be the same under our law; unless I am incorrect as to the parity of the cases, or unless that which is equity, under the same circumstances, at one place, is not so at another. It may be said though, that this course of decision forms a part of the custom, and that our law has not adopted every part of the custom, much less these decisions. I do not think it material to investigate the details of the custom, and to compare them with our law, as it is enough for me that the decisions above referred to are not certificates of recorders, but the application, by learned judges, of principles of equity to the rights of parties arising under a law, which, though not general, is obligatory where it is the law; and which course of decision, it appears to me, as it did to them, was necessary to prevent that law becoming a dead letter. The recorder, if necessary, certifies the law from which the right springs, as, in this case, the incapacity of the freeman, according to the custom, to bequeath the whole of his personal property from his wife, as is also declared by our law ; from which leading and primary feature in the custom, and positive provision in our law, the rights of the wife in both cases arise ; and to prevent the evasion of which law, and the prostration of which rights, the courts interfere : — and, although the custom may, in some of its minute details, differ from our statute, I consider that circumstance cannot impair the applicability of those decisions to cases arising under our law, unless it appears that those decisions are *54 bottomed, in part at least, on such variant details. This, however, I believe, cannot be shewn, but that, on the contrary, those decisions relied on, as applicable to the present case, are bottomed on the aforesaid incapacity of bequeathing, and which, it is manifest, is common to both countries.
But suppose, since the abolition of the custom of London, by the statute of II. Geo. 2. cli. 18., a freeman, as he is authorized to do by that statute, by marriage articles agrees with his wife, that, if he dies first, she should take that share of his estate to which she would be entitled according to the ancient custom of London; what other rights would she have,, under this agreement, than a wife formerly had under the custom ? none as I apprehend ; it being merely, provided by the legislature that those who wish still to be governed by this custom may by contract retain it, as the law of their case, (a) The wife, however, acquires no other or farther rights than she would have had, if the custom had remained the law of the land; yet here is a contract which we would all admit ought not to be evaded by any shift or contrivance; (b) the husband in this case, it is true, has a right to throw away his property, to give it away, &c__but he cannot bequeath the whole of it from his wife; he has made a contract not to do so ; and he is not, by shift and fraudulent device, to evade his solemn contract. This contract, however, if I am correct, is only equal to the law, — gives no greater or other rights : and therefore the courts could not interpose, to prevent an evasion of it, on principles which would not equally apply to a case arising under the custom or law. But it is contended that, by our law, the husband may dispose of his property from his wife in any way, except by will; and that if it is not a testamentary act, all is safe. Suppose he conveys his personal estate to trustees to suffer him to keep possession and enjoy for his life; afterwards, to such uses as he by his will should declare ; and, in default thereof, to A. B. and C., his children, &c. in exclusion of his wife : — he may finally bequeath it to her or to strangers, but he dies without a will. He enjoys the property for life, has at his death the power to bequeath, which he omits to exercise, and so the case is left; his neighbour makes a like disposition of his property by deed, but makes a will and appoints the same children, who *55 were mentioned in the deed, to take the use, after his death. Each of these men leave a widow. For what good reason will the widow of the second receive a third of her husband’s pergonal estate, when that of the first gets nothing ? I cannot perceive any reason which is satisfactory to me for such diversity; nor would it take place, I apprehend, in England, it both cases were decided there, under the custom, as I think will be manifest from the case of Turner and wife v. Jennings, &c. 2. Vern. 685, & Fenb. Bk. 1. ch. 4. § 16. It is true the letter of our statute is not violated in the first case above supposed; but if the wife, by that device, should be deprived of her thirds, the statute would be little more than a letter. — That the case before us is more complex, guarded, and intricate than that put, may be very true ; but, I believe, on a fair examination, and which I will endeavour hereafter to give, it will not be found to be essentially variant or stronger. So, in case oí a donation mortis causa. This is not a testament, yet it is so much in the nature of one that it will not deprive the widow of her share, under the custom, according to British decisions. [a) Would it deprive her of her thirds under our law ? It is, however, a disposition of the estate otherwise than by will; and if that is the only criterion to go by, it would. Upon the whole, when I reflect that our legislature, at a very early day, limited the power of bequeathing, as above stated, borrowing the idea from wliat was then the custom ; when they afterwards borrowed the statute of distributions from that of England ; and, in the place where that statute reserves the custom, &c., they introduce the same principle, so far as it respects the wife; at which time, I must presume, they were well acquainted with the decisions of the courts on the principle so engrafted into the statute, and were willing to abide thereby ; I think it will be safer to be governed by those principles, so repeatedly acknowledged and acted upon, than to leave the parties at liberty to devise shifts and contrivances to violate the spirit of the law, thereby reducing it to a dead letter.
It is argued, however, that to apply the decisions under the custom to our Jaw would render wives independent, and encourage rehellion, desertion, &c. — on this very ground I should regret an alteration in the law, so as to give a complete testamentary power, as in England. A resort- to marriage settle- *56 meats is the consequence there, and soon would be here. By this means, the wife is rendered more independent there, than she was under the custom : she can make the house and bed of her husband as uncomfortable as she pleases, and loses nothing by it: whereas, if he could, by absolute gifts to hi3 children, or bv seeking abroad those comforts he is denied at home, leave her pennyless at his death, she might find it her interest to conduct herself better : as, therefore, I would deprecate an alteration of the law, in this respect, so would I any course of decision that may tend to render it nugatory, as resulting in the same consequences. — It has also been argued that no decision of this kind has taken place, in this country, except the case of Cooper v. Brown, decided by the late Chancellor Wr the, who applied these doctrines to a ease which I think was not as,, strong as the present; and this silence is taken as a proof that our courts do not consider these principles as applicable to our law. — I should rather take it as a proof that the case above referred to, which was not appealed from, and the present, are probably the only cases of a flagrant attempt of this kind ; but if they are not, they are the only cases brought before the courts; and because principles of equity have not been acted on, we are not to conclude that they do not exist. — The question whether they do exist, as applicable to our law, is now for the first time to be decided by this court; the importance of which question I hope will be some apology for the extensive view I am endeavouring to take of the subject.
The donor, in this case, although he professes in his deed to make an advancement to his children in his life time, in reality intended no such thing : some of them were minors, and incapable of taking care of such property, and he retains to himself the fastest hold of every thing during his life. — None of the trusts were to take effect, in possession, until after his death. He retained a right to sell a large stock, to raise money from any of the property to pay his daughters portions, as also all his debts, as well those then contracted, I presume, as any he might thereafter contract. Who was to prevent his buying lands, or other property, and paying the debts, thus contracted, out of this fund ? Nay, what was to prevent a sale of every thing ? The deed is voluntary; is a deed of trust, and *57 recorded on the evidence of two witnesses only : purchasers without notice would be protected, but if they had notice, how could they judge when enough was sold for the above purposes ? Here are no scheduled debts ? Even if a court of equity would interfere, on application, to prevent this, yet if no application is made, the trustee is to be brought into no trouble for neglect.
As to the stock though, he is to account for sales; — but when ? He has the whole during life ; and out of what funds is it to be paid, if the whole, together with the property retained, was squandered, given away, or vested in lands for his children unprovided for ? The whole of his extensive credits, public stock, &c. with the deeds and evidences of them, not only remained in his possession during his life; but, I apprehend, the legal right to assign or recover them, and grant acquittances also remained in him, and that payments to him, or transfers and assignments of them by him, would have been good. Had they been also collected and squandered, or laid out in lands, as above, would a court of equity have decreed the latter to the present cestui que trust ?
With respect to the two minors, the deed limits over the money to be raised and the proceeds of these credits, &c.„ as though he had been making a will: — payment of debts, &c. are provided for as in a will; in fine, he being in very low health, if a will could have effected what was intended by this deed, no doubt can remain but that course would have been resorted to; and I therefore think this deed, under all the circumstances, has been well termed a mill in disguise.
His opinion that he had, in fact, the power to make it so, and to prevent any interference with his conduct, ay to this property, in case of recovering his health, by means of the vast real property which was not settled with the slaves to work it, as it would have been had a real advancement been intended, but which he retains the power to deprive bin sons of, in case of improper interference, is manifest from his declarations to this effect to his friend and confidant the defendant Tyler aa proved by the witness Bullock. He says, in substance, that, being in company with governor Tyler, be said that he had written the will of Lightfooi, at his request; that, previous to that, Light-foot had inquired of him whether lie could not dispose of his *58 slaves so as to prevent his wife from her dower in them after his death: that he told him if he did really give them away in his life, without having any claim to them afterwards, in any way whatever, that it would prevent her from dower, and asked said Lightfoot what he would do, in case he should live for any length of time, or recover from his indisposition; he said he would always have landed property sufficient to make his children, to whom he was about to give or had given his slaves, dependant on him, or words to that effect.
Nay, had the whole or the greater part of this large personal estate been bequeathed to his wife, and his children unprovided for, and the land devised to the sons, on condition that this bequest should not be disturbed under the deed, or if it was, that the legatees should then have the land, I believe such bequest would not have been disturbed. And as a practical example of what he himself, and even the defendants, thought of the business, during the very short time he did live, I will instance the gift of his wife’s jewels to his daughter, the power to do which is insisted on in the answer ; and the sale of tobacco, to a large amount, to a Mr. Conway Whittle, soon after the date of the deed. In fact he had it in his power to dispose of this property as he pleased, and to make it the interest of the cestui que trusts to submit.
If I am wrong though, in this main question, there is nevertheless one portion of the property comprised in this deed, to wit, the credits, public stock, &c. which perhaps ought to be considered with reference to another principle. As this point, however, was not noticed in the argument, I advance to it with considerable diffidence : but if the legal title in these subjects remained in Lightfoot; it he alone could have sued to recover the debts, and had a right to collect and grant acquittances therefor, and to transfer the stock; and if this right and title devolves on his executors, then the trustee and cestui que trusts must claim through them in consequence of an alleged equitable right arising under the deed of trust. So far as this deed vests the legal estate in the trustee, the appellees cannot be said to claim through the executors, who would not take that fund even for payment of debts; but (hey claim to set aside that deed, merely as to them, in the same manner as a creditor would claim to set it aside, as being a fraud on the rights of the *59 wife, secured to her by the statute. In every other respect, it is admitted that the deed, so far as it conveys the legal title to the property, stands good : But as to the fund now in question, to wit, the credits, &c., it goes, as I apprehend, to the executors in the first instance, and is assets in their hands, and the parties must claim through them according to the nature and validity of their respective rights. A suit is instituted by the appellees to set aside tiie deed, as above, and also to have their distributive share of the assets in the hands of the executors.
The distribution, according to law, of a large portion of these assets, however, is controverted by the trustee and cestui que trusts, on the ground of an equitable claim thereto under this defective conveyance; and the question is, whether a court of equity will help such conveyance in favour of mere volunteers otherwise amply provided for, to the prejudice of the legal rights of the widow, who, by this deed, if I ain wrong in the preceding opinion, has been deprived of her reasonable share in the other personal estate, and left with two young children to support and educate, who are entirely dependent on her,
I am not at present satisfied that the appellants stand on higher ground, as to this matter, than they would have stood as plaintiff’s in the cause ; on the contrary I incline to think that the executors must be considered as stake holders, as to this subject, and the other party to interpleaders, or as the wife and distributees would have stood had not this deed been interposed; and that, as in cases of suit for partition, in which all parties are considered as plaintiff’s, each would be preferred or postponed according to the merits of his claim, without considering whether he was plaintiff or defendant in the suit, and, at most, only permitting the law to prevail, when the scales were perfectly equal as to the equity. Neither I apprehend are to be considered in possession ; for, though the trustee is also executor, he never qualified, and there are other executors who did qualify ; nor do I perceive any evidence of a transfer of this subject to him as trustee. In fact the credits may not yet be collected. Considering this fund then in the hands of the executor as such, and considering also that, as to the appellees, the will has no operation, the law of distributions must then prevail in their favour, unless there *60 is some conveyance founded on sufficient consideration to intercept it and turn it out of the course prescribed by law. Now, if a will, which so far vests the legal title in the legatee that a bare assent of the executor renders it complete and effectual, would not carry this property from the wife, according to our law, to the legatee who is a volunteer, shall the same legatee take the same property by a defective voluntary conveyance, not vesting in him, (but for the purpose of postponing the wife, in defiance and violation of the law) as good a title as he claims under the will ? For, suppose the wife had died before the husband in this case, so that it would not have been necessary to set up this deed to defeat her claim, the parties would have taken immediately as legatees under the will, and not as cestui que trusts, under the deed ; for, claiming under that, without the aid of the will, they would probably have been compelled to yield to the superior equity of the unprovided for children, as herein after stated. If the wife’s title under the law, though, is superior to the will, and cannot be defeated by it, and if the title under the deed is, in law and for every purpose, except for the bare purpose of defeating the wife, inferior to that under the will, how can it be set up as superior to her title under the law ?
But to test this more fully by general and well established principles of equity; let us suppose that Lightfoot himself was in being, that he was reconciled to his wife and satisfied of the injustice he had attempted, towards her and his children by her, in this deed; and, to repair it as far as possible, was about to collect these credits with a view to make some provision for her and them ; would a court of equity, in a suit brought by the trustee to prevent this, interpose to help this voluntary conveyance ?
The general doctrine, as I at present understand it, is this, that where a deed is not sufficient in truth to pass the estate out of the hands of the conveyor, but the party must come into equity, the court has never yet executed a voluntary agreement. — To do so would be to make him who does not sufficiently convey, and his executors after his death, trustees for the person to whom he has so defectively conveyed : and there is no case where a court of equity has ever done that: whenever you come into equity to raise an interest by way of *61 irust, you must have a valuable, or at least a meritorious consideration : — nothing less will do : — and there must not only be a consideration as a motive for relief, but it must be a stronger consideration than there is on the other side.
It is true that this is a provision for children, which generally is esteemed a consideration sufficiently meritorious; but then this may be done away, if there is something equally meritorious on the other side, as when the heir is not provided for, &c.- — But, in this case, suppose there was no will; and that, this fund being in the hands of the executors, it was a question with the court, whether the defect in the conveyance should be supplied, in favour of the children by the first marriage, having a large provision made for them in so far as the legal estate vested in the trustee, to the total exclusion of those by the second; would the court not find sufficient reasons for withholding their aid ? No particular child here is heir at law, but all succeed equally; and so, according to our jurisprudence, Ihe father is as much bound to provide for one as another. He attempts though, to give all to one, or a few, but fails to make a legal conveyance, and the party claiming under the deed cannot succeed without the aid of a court of equity ; — according to the principles above, that aid, I apprehend, will not be given.
If, though, there had been no will, and the unprovided for children had been before the court, and their equity had prevailed over the claimants under the deed, would not the wife also have prevailed and taken her share ? But if she and the children, unprovided for, would together have greater equity, in case the will had not barred their pretensions, how is her claim lessened, when the will is,of no avail as to her ? — The children unprovided are repelled, not because the deed gives superior or even equal equity to their just claim, but because they are cut out by the will; and the widow is to bo defeated, not by the will that is of no avail as to her, but by the deed, which is not sufficient to defeat the legal claim of the children, if the will, as to them, was out of the way '. t!
If it is true that the widow gets valuable dower lands, but without slaves to work them ; but these she gets, not from the justice or bounty of her husband, but because she could not be deprived of them. — Her dower right, though, in the lands, *62 is vested in her by the marriage, as a purchaser, to take effect in possession on the death of the husband, unless she aliens in the mean time, and cannot fairly perhaps be considered as a provision by her husband — I doubt therefore whether this ought to have any weight, especially when we consider that the law does not vary the widow’s claim in the personal estate according to the magnitude of her dower in the lands, and when we farther consider that the law will not permit her rights in the personalty to be defeated by a will, and therefore I presume the courts ought not to permit a defective deed not conveying as good a title, any more than a will, to defeat her. A wife in England, even now, when every thing can be bequeathed from her, is spoken of as standing in the next rank to creditors ; and our law, if it does not place her on higher ground, surely does not detract from her pretensions.— But may not demerit or great hardship as to the object and intention of the voluntary conveyance also reduce it below the level of the claim on the other side ? If so, can there be a stronger case than the present, where it clearly appears that the whole and sole object of this deed was by shift and device to evade the statute, and to defeat the wile’s claim under it ?
But if the consideration of the magnitude of the wife’s dower, in the real estate, could so far avail in this case as that the court could decree to her, upon terms that she should make a settlement upon her children unprovided for, even this would measurably effect the justice of the ease.
This subject would have claimed a more full and satisfactory investigation on my part, were it not that, on the great question, as it regards the whole property comprised in this deed, I am, for the reasons above assigned, for affirming, in principle, the decree of the chancellor.
Judge Brooke. The original bill filed in this eause charges that William Lightfoot, the former husband of Anne C„ Colgin, one of the appellees, combining with his children by his first wife, and others, to defraud the said Anne C. Colgin of her dower and due proportion of his personal estate, and to disinherit her children, executed on the 21st of April, 1809, a deed to William Allen for all his porsonal estate, except seventy-five slaves, upon trust, for the benefit of his children by his first *63 wife; and that, of the seventy-five slaves, a portion was, afterwards, in the month of May, fraudulently conveyed, for the same purposes, to William FI. Lightfoot, George Blakey and wife, and Anne C. Lightfoot, all of which conveyances are prayed to be set aside, for the causes assigned. The amended bill states that there was a marriage contract, by which the appellee Anns C. Colgin was to have not less than fifty or sixty thousand pounds, and prays to be relieved against the operation of the deeds on that contract, and to have a specific execution of it.
Putting out of the case the pretended marriage contract, which is not supported by any adequate proof, and admitting (what I think seems established by the evidence,) that the deeds were executed with the intention to defeat the claims of the wife to that portion of the estate to which she would have been entitled in the event that her husband had died intestate, or leaving a will which she might renounce ; the inquiry is, whether the wife has such an interest in the personal estate of the husband during the coverture, that a fraud has been committed upon it by the operation of the deeds in question. In making this inquiry, I shall endeavour to place the subject in the two distinct views that were taken of it by the counsel for the appellees. The first position is, that the deeds are fraudulent because they defeat the rights of the wife under our statute; the second, because the deed of trust to Allen is not absolute and unconditional but testamentary in its operation.
The correctness of the first position must depend on a sound construction of the statute of 1785, in connexion with the preceding acts of 1727,1705, and 1672, by which the interest of the wife in the personal estate of the husband is recognized and ascertained. The act of 1785, (which was re-enacted in 1792,) 25th section, declares that, when a widow shall not be satisfied with the provision made for her by her husband’s will, she snay, within one year from the time oí his death, in the manner. therein prescribed, renounce all benefit which she might claim by the same will; and thereupon such widow shall be entitled to one third part of the slaves whereof her husband died possessed, which she shall hold during her life, and moreover be entitled to such share of his personal estate as if he had died intestate. In considering that act, I have bees unable to dis *64 cover any thing that can affect the absolute and exclusive its» terest of the husband in the personal estate during the coverture : — its whole operation on this branch of the subject is evidently confined to a limitation of the power of the husband to dispose of more of the personal estate by will, than is therein prescribed^ and only giving to the wife an interest in the personal estate after his death, and not before. This exposition is in perfect correspondence too with the preceding acts; the first of which, and the earliest that I have been able to find, the act of 1672, for the purpose of settling some doubts as to the rights of the wife, (whether to dower in the lands of her husband, or to a portion of his personal estate, does not sufficiently appear,) for the first time negatives the power of the husband to dispose of more than two thirds of his personal estate by will; which negative is handed down to us, through the other acts, until we come to the act just recited. But it is argued that this exposition of the rights of the husband does not comport with the rule of the common law, which is supposed to have been adopted by the acts referred to, and which rule is best understood by a reference to the decisions on the custom of London, which it is contended is nothing more than the old common law, by which the rights of the wife are protected against the operation of the deeds in question. What the common law was in England, before the several acts on that subject were enacted here, appears not to be very clear. The rule, that the wife was entitled to a reasonable part of her husband’s personal estate in case of intestacy, has not been doubted; but that she was entitled aho to a like proportion in opposition to his will, is not satisfactorily deducible from the general law and, if it were, I think I shall be able to shew that no fair inference from the rule itself would affect the present question. Blaclcstone, (the authority most relied on as to this point,) after deducing, in his 2d vol. p. 490, from Noah down to Jacob, the power of the husband to bequeath the whole of the personal estate, says, in p. 491, “ with us in England, this poYver of be- “ queathing is coeval with the first rudiments of the common “ laYV; for we have no traces or memorials of any time when 61 it did not exist,” &c. — Taking this passage in connexion with what had been said before, and the inference would be conclusive that this power of bequeathing which he speaks of *65 extended to the whole of the personal estate in exclusion of the rights of the wife, which is lord Coke’s doctrine in 2d Institute, p. 33, and Swinburne’s also, whose authority in this country has never been questioned, that I know of. — But Blackstone, in p. 493, qualifying what he had before said, says, “ we are not to “ imagine that this power extended to the whole of the personal “ estate of the husband,” — denies the law as laid down by Coke, and says, he look the exception for the geueral rule, and quotes Bract on, (from whom lord Coke in some measure got the law,) and GlanviUe and Fleta, to prove the correctness of his criticism. Without meaning to settle this controversy as to what the law was in England, which I think will be found to have no influence upon the decision of the case now under consideration,! shall make huta very few observations on it. If the right of the wife to the writ de rationabili parte bonorum, in opposition to the will of her husband, was founded on general law, it seems extraordinary that it should have been often pleaded, (as is said by Blackstone, p. 492,) as the local custom of Berks, Devon, York, &c.,; because we are informed by the same author, p. 262, that custom is a local usage, as distinguished from prescription which, is personal, both of which are exceptions to the rule of the common law; and it is equally remarkable that the statutes, to which he refers, as intended, as he says, to reduce the whole kingdom to the same standard, were evidently intended to abolish the customs of particular places, wherein the rights of the wife now contended for, were acknowledged. The circumstances strongly favour the position of lord Coke and Swinburne, that this right of the wife was founded on custom, and was no part of the common law. That there was great diversity of opinion, in the old books, on this point, is stated by lord Coke himself, and he adopted what he supposed the better opinion : — that this diversity prevailed long after is probable; — but 1 have been unable to find any decision controverting the opinion of lord Coke ; and, as late as the year 1 737, lord Hardwickc in the case of Heron v. Heron, (a) seems to concur with lord Coke. — Indeed, if the rights of the orphan under the custom of London are founded upon the writ de rationabili parte, (as Blackstone says it is,) lord Hardwicke, in the case referred to, expressly declares that the father according to the *66 general law, had full power to disinherit his children, but was restrained by the custom. — Much more might be said on this subject: — The incongruity in that which is custom, being a part of the general law, to which its definition imports it to be an exception, might be remarked upon; — but leaving it to the antiquarian (to whom it more properly belongs,) to settle the controversy between lord Coke and Blackstone, I shall proceed to consider the question in reference to our own acts, whatever may have been the rule in England. — Our first inquiry, when expounding our own statutes is, what was the understanding of the legislature, as to the rale here, when these statutes were enacted. — The act of 1662 is the earliest. At that time, Blackstone had not given to the world his learned Commentaries: — His elucidation of the point now relied on, was not known to the legislature ofVirginia: — Coke upon Littleton, and the Institutes were the oracles of the laws in this country ;— they were the text books of the lawyers and legislators of that day; and the phraseology of the act last mentioned, and the successive one on the same subject, confirm the idea, that the law as laid down by lord Coke was in the mind of the legislature, when the act of 1662, and the act of 1705 passed. — This second act on the same subject, and which follows up the act of 1662, declares that, when any person dies testate, if he leaves one or two, and no more children, he shall not have power to dispose of more than two thirds of his.estate by will to any other person or persons than his wife, &c. — These expressions leave no doubt in my mind that they were intended to restrain the husband in the exercise of a pre-existing right to dispose of his whole estate by mill. The language of the legislature used in this passage, indicates, too strongly to be questioned, the intention to alter the then existing law, and intimates, as plainly as it could do, what the law was which was intended to be altered. — The act of 1727, gives no additional light on this part of the subject: — it limits the right of the Wife to renounce the will of her husband to the period of nine months. — The act of 1785, which was re-enacted in 1792, extends the time to twelve months, and, after prescribing the manner in which the wife is to renounce the will of her husband, declares that, thereupon she shall be entitled to one third of his slaves, of which he died possessed, which she shall hold during her life, and to such *67 share of his personal estate, as if he had died intestate. By referring to the case of intestacy by which to fix and explain the degree of her claim, it excludes, as forcibly as possible, the idea of her having a more exalted right to the personal estate, during the coverture, than any other distributee, and places their claims upon the same foundation. — Her renunciation of the will gives her no higher pretensions than if her husband had died intestate : — in one case she claims through the executor in the other, through the administrator. — Acts which he himself could not avoid in his life time, cannot be avoided, I presume, by those who must claim in his right, and merely as his representative. — If he had devised the property in question, it would not have passed by the will; and her renunciation of the will would not better her case, because, under the act, she must take as if he had died intestate; and it follows, by a necessary consequence, that he could not, by operation of (he act, under any consistent construction of it, he made to die intestate as to property which he could not devise. — This view of the subject would seem to exclude the necessity of saying any thing of the cases decided on the custom of London; but, as they have been much relied on in the argument, I shall take a brief view of them. — Admitting that the custom is a part of the common law, as has been contended, and not an exception to it, as all customs are said by Blackstone to be, and that our acts of assembly have adopted or rc-cnacted the common law, these decisions upon the custom will be found, on examination, to be very unsafe expounders of those acts. — • They contain principles entirely novel in this country, and by no new construction, however tortured, to be extracted from the acts themselves, or, in my opinion, from the naked rule of the supposed common law itself. — In the case of Fairbeard v. Bowen, (a) it was decided that a voluntary judgment confessed by a freeman of London shall not prevail against a simple contract creditor, or againsl the widow, hut she must have her share according to the customand, in a note to that case several cases are referred to, to shew that the widow and orphan of a freeman are in the nature of creditors, and that any loss happening by the insolvency of the executor must be borne by the testamentary or dead man’s part. — This doctrine does not result from any fair exposition of our acts of assembly, *68 or of the supposed rule of the common law : — a bare right to a reasonable share of the husband’s estate, of which he might die testate or intestate, without any restraint upon him in the use of it during the coverture, makes the wife nothing more than his representative, and could not place her in the rank of a creditor: — She has never held that rank under our law.— The inference I draw from this is, that all the consequences which make up the doctrine relied on, (if I am to admit that the custom grew out of the common law,) must have been superinduced by the application of that rule to the peculiar situation and circumstances of the citizens of London, or by engrafting on the rule the local usages of the place. Thus, we know that the doctrine of waste, in this country, differs from the doctrine in England, though extracted from the same law.- — . This inference is' much strengthened by a nearer view of those customs, from whatever source they may have sprung. — Black-Stone, (1st vol. p. 75.) says, “ this custom, and many others are “contrary to the general law of the land;” and, in p. 76, he says, “ the customs of London differ from all others in point of “ trial j — they are tried not by jury, but by a certificate from the lord mayor and aldermen.” — For all that appears to the contrary, these decisions upon the custom may have been hot. fomed on some of these certificates. — If it were admitted, then, that the custom was nothing more originally than the rule of the common law, and also that our acts adopted that rule, these decisions upon the custom would be very blind gdides in corn ducting us to the true exposition of our statutes. — The cases of Turner v. Jennings,(a) of Edmonson v. Cox,(b) Coomes v. Elling and wife,(c) Tomkins v. Ladbroke,(d) and a long list of others that were cited, appear to me to have no bearing on the question now to be decided, except to prove that if a freeman of London disposes of his property by an incomplete conveyance, or in such manner as not to' take effect until his death, it is a fraud upon the custom. These cases, if they apply at all, have more bearing on the second point that has been made in this cause. — As to the doctrine that an incomplete conveyance would be a fraud upon the custom, — so far as it can be made to apply to a conveyance which did not divest the grantor of the property, so as to prevent bis dying intestate in relation to it, or disposing of it by will, I presume in such case a conveyance *69 of that description would not defeat the right of the wife under our law. — But the deeds in this case, in my opinion are not exposed to that objection. — As to the interest intended to be passed by them, and which is the subject of this controversy! I see nothing, in the deeds, which left to the grantor any contro! over that interest incompatible with the grants after the execution of them. The reservation of a life estate in some of the property conveyed will be noticed in the examination of the second position.
That position is, that the deed of trust sought to be set aside, is not absolute, hut a mere testamentary act revocable by the grantor. — I shall leave out of the examination of this point the suggestion that it was to have been re-delivered to the grantor in the event of his recovery from the sickness, with which he was then afflicted; — because that fact is not sufficiently proved, and, if it was, 1 am not satisfied that it would affect the CtlSC.
The deed is said to be only testamentary, because (as the phrase is in one of the eases upon the custom,) the grantor did not dismiss himself of the property: — but I think the answer is that ho did dismiss himself of his whole interest in the re-per.dmi, which was all that was intended to pass by the deed: - — it was not intended to affect his life interest in the property.— The essential character of a testament is that it is at all times revocable ; hut it will not be said that the deed in question could have been revoked by the grantor; or that the interest conveyed to the trustee would have passed by his will; or, putting the claims of the wife out of question, that it would have devolved on an administrator. — The principle, which admits that the grantor might have disposed of his whole interest in the property for the purpose of providing for his family, cannot be made to deny him the right to dispose of a part of it for the same object. — The objection that, by reserving the life estate, he had the full enjoyment of the property, and In that sense did not dismiss himself of it, is (bunded on the supposition that the property must be enjoyed to the full extent of the interest of the owner in it, or it would not be beneficial.— The answer to that is, that to retain the reversionary interest in property is not always the best way to enjoy it: — to deprive (he husband of the power in his life time of disposing of *70 any portion of his interest, especially in slave property, would limit his means of advancing his children, and give to his wife a higher claim than that even of a creditor under some circumstances ; — a consequence which cannot be admitted by any fair construction of our law.
With respect to the public stock, and other credits, included in the deed of trust to Allen, if the children by the last marriage were complainants in this case, the question which might arise in relation to their rights thereto, would merit examination, and would be susceptible of views not now taken.
I concur therefore in the decree, which is to be entered as the decree of the court.
Judge Roane.' In deciding the question relative to the validity of the deed, I will admit the most for the appellees ; and that is, that it was more the intention of the grantor, in executing it, to impair the interests his wife would have been otherwise entitled to in his estate, than to provide for his children. ' It is manifest, from the testimony, that this was a determination long previously formed, and never abandoned. This intention is, also, clearly betrayed by the unusual and over cautious expressions contained in the deed itself. As to these, the maxim, “ clausula inconsueta semper inducant suspicionem,’3 forcibly applies. I have no hesitation in admitting that, as to creditors and purchasers, the deed would be considered fraudulent. It is not to be forgotten, however, that the grantees in it are the children of the grantor ; an obligation on the father to provide for whom, is said by this court in the case of Ward v. Webber, 1 Wash. 274., to be a good consideration both in law and equity. The contest, then, is between children, who are more than volunteers, especially as they are not shewn to have been otherwise provided for, and the wife ; who maugre this effort of the husband, had an ample provision of which he could not deprive her. There is no strong preponderance of claim in point of equity, therefore, on the side of the wife, when contrasted with the claim of the children. In the case of Taylor v. Jones, 2 Atk. 603, which was a contest between the wife and children on one part, and the creditors on the other, it was said by the master of the rolls, that, although he had great compassion for the wife and children, yet, if the creditors should not *71 receive their debts, their wives and children might be reduced to want. So, in the case before us, although some compassion is, perhaps, due to the wife, as much, or more, is due to the children, who, or whose wives and children, may, by setting aside the deed, be left in a measure unprovided for.- — I mention this to shew, that this consideration of compassion ought not to influence us much, as it applies on both sides, and ought rather to preponderate in favour of the party otherwise unprovided for. I must also remark, that if this decision is to be influenced by considerations of a supposed inequality between the relative provisions for the parties, (the amount of which, however, is not proved in the cause,) it will form a rule in cases in which no such inequality exists : and that, if a deed clearly fraudulent under its actual circumstances is to be set aside in this case, the next effort will be to vacate one which is merely considered fraudulent by being voluntary. In Russel v. Hamond, 1 Atk. 15, it is held that the circumstance of a deed being voluntary is considered as an evidence'of its being fraudulent. Where are we to draw the line between the two cases 2 between that of a deed impeached as fraudulent by positive acts of fraud attending its execution, and one which is only inferred to be fraudulent by being shewn to be voluntary ? We are getting into a wide field ; one which would set aside, in favour of the wife, a deed however fair, and however inconsiderable as to the provision it conveys to a child, if it be merely voluntary, or without a valuable consideration !
Admitting this deed to he clearly fraudulent, does it not cease to be so, quoad, the appellees, if they have no interest to entitle them to impeach it ? Must there not be two parties, before a deed can be considered and set aside as fraudulent, the party defrauding, and the one defrauded ? — and can the last exist unless he has a vested interest ? It is held that, by the common law, a person having a debt due him, or a right or title to a tiling, might avoid any fraudulent conveyance made to deceive or defraud him of that right or debt : (a) but it is said that, if the conveyance was precedent to the right or debt, there was no way to set it aside ;(b) and, again, it is held, that he who hath a right, title, interest, debt or demand mere puisne, shall not avoid a fraudulent gift or estate precedent, by the common law.(c) It is by these principles of the common law, *72 that the ease before us is to be tested; for the statutes made m aid thereof only apply to creditors and purchasers. If the right of the wife in this case is puisne and posterior to the dale of the conveyance, she cannot impeach it according to the foregoing principles of the common law ; if, on the other band, her right be considered precedent thereto, it would carry with it a right to restrain the husband’s power of alienation in his life tíme ; but the husband’s power of alienation in his life time b- conceded by the appellee’s counsel, who only object to the deed before us as being, as they say, a mill in disguise. If a right existed in the wife to restrain the alienations of the husband, she would be more than a volunteer ; she would, at least, take the rank of a creditor. It is admitted that, under the custom of London, (as will be presently more particularly noticed,) the wife is sometimes considered as a creditor ; but she has never been so considered in this country, and cannot take either negroes or other personal property, but in subordination to creditors, after they are satisfied, and in the mere character of a (113-tributee. This is admitted even by Judge Tucker (a); a gentleman who, in the cases of Claiborne v. Henderson,(b) and Ambler v. Norton,(c) to say nothing of his commentaries, seemed disposed to go as far in behalf of the rights of widows, as perhaps any judge w'ho ever sat in this country. If then, the wife is not a creditor, nor to be considered in the light of a creditor, as to her husband’s goods ; if she cannot restrain his disposition thereof in his life time; where is her interest, which, under the foregoing principles of the common law, will sustain her in objecting to the alienation in question ?
As to the claim of the wife to a provision from her husband’s estate after his death; — while it is founded injustice and equity, it does not extend to the whole thereof. It is to be limited by the positive provisions of the law. This was decided in the aforesaid case of Claiborne v. Henderson. There is no hardship in this; for she knew the extent of her rights, and of the husband’s power over his property, when she married him. There is the less hardship in allowing the husband unlimited power of disposition over his personal property in his life time, as she gains an indefeasible interest in bis real. She is therefore bound by the positive provisions of the statutes. The act which immediately relates to this subject, declares that, *73 when a widow is not satisfied with “ the provision made” for her by her husband’s will, she may renounce the same, and, thereupon, she shall be entitled to one third part of the slaves of which he died possessed, lo be held for life, and he moreover entitled to such share of his other personal estate, as if he had died intestate, to hold as her absolute property : and, on recurring to (he act relative to this last subject, it is said that, when a person shall die intestate as to his goods and chattels, or any part thereof, after his debts shall have besnpaid,&c., one moiety, or, if there be a child or children, one third of the surplus shall go to the -wife, and the residue shall be distributed, in the same proportions, and to the same persons, as lands are directed to descend in and by the act provided on that subject. The first mentioned act, in speaking of the “ provision made” for the wife by her husband’s will, seems to exclude the idea of a provision paramount and anterior to the will. It supposes the provision to be made by the will, and not by the law, except in the case of her renouncing the will, in which event, she is restricted to the third of the slaves of which her husband died possessed. It excludes the idea of an interest in the wife paramount and anterior to tire will, which would afford her a foundation to stand on to impeach her husband’s alienations of property in his life time. Such an interest would he deemed a provision; and yet this act goes on the ground that no provision existed but that made by the will. The act recognizes only two classes of provisions ; that made by ike will, and that which is to take placo on the renunciation thereof, as is evidenced by the term “ thereupon.” It does not recognize an in-forest which would enable her, as it would a creditor, to set aside a voluntary or fraudulent conveyance, and which would, consequently, be in effect a provision. So, when the act says that she shall have one third of the slaves of which her husband dialpossessed, (by whieEt I understand entitled,) it excludes her from those to which he was not entitled at the time of his death, in ccnseqiícace of having previously conveyed them away, it is a complete recognition of his right of alienation as existing oa general principles; it is equivalent to saying that she shall not have ¡such as he did not die possessed of, by iiaving sold or granted them away in his life time. The construction of the act in this particular, is analogous to that on *74 which this court proceeded iu the case of Templeman v. Steptoe, 1 Munf. 370. Iu that case it was held, upon the construction of a clause of the act of descents, that the exclusion of the mother, in case there be a brother or sister on the part of the father, was equivalent to a declaration that the last mentioned persons should themselves succeed. The right of the husband to the dominion over his personal estate is absolute and com" píete, except so far as an exception is made in favour of the wife. That, in the case before us, extends only to such slave* as he died possessed of; his [lower over those antecedently sold, or given away, is admitted, as well by the principle of the decision just mentioned, as by the principle that the exception proveB the rule.
If, then, the wife, as to the persona! estate of her husband, is not to be considered as a creditor ; if she has no vested interest therein; if there be no decisions to this effect, either in this country, or iu England, except upon the construction of the custom of London, is it fair to apply the decisions under that custom, in which she is sometimes held to be a creditor, and at others to have a vested interest, to the case before us ? If, under that custom, she has a ground to stand on to impeach the conveyance, can she do it here where no such interest exists ? I do not profess to understand that custom, nor the decisions under it; but this I understand, that, by the principles ;of the common law, no person can complain of a fraud who has not an interest in the subject in question ; and that a wife has no legal interest in her husband’s goods, during his life time, that can prevent his aliening or giving the same away. I also understand that the wife under that custom, is considered as having an interest therein. I shall not stop to inquire on what grounds (not applying in this country) this has been so decided in England ; but I will refer to a few of the cases in which the interest of the wife and of the children under the custom, is placed upon a footing, and has a dignity, never ascribed to the claim of the wife in this country.
In the case of Tomkyns v. Ladbroke, 2 Vesey, sen’r. 591., it was held that the interest of a child under the custom, was an inchoate right, and a ground of advancement in marriage ; andthat, although such child cannot, strictly speaking, be said to be a creditor, yet, that that is an analogous expression, *75 when applied to such child. In the case of Heron v. Heron, 2 Atk. 167., it is said that the intent of the custom was that the children should be advanced in marriage thereby ; and that, on that ground, agreements respecting it are supported inequity. The same doctrine is laid down in Kemps v. Kelsey, Precedents in Chan. 594. So in the case of Fairfield v. Bowers, 1 Vern. 202, and 1 Fonb. 278., it was held that a voluntary judgmeut should not prevail against simple contract debts, nor against the widow of a freeman, who should have her share notwithstanding ; but that the said judgment, (his debts being paid) would bind the legatory part. In a note to that case it is said, that the widow ai^l orphans under (he custom are in the nature of creditors ; and that, in case of any loss by the insolvency of the executor, it should be home by the testamentary part only. So it is held in 2 Bac. 256., that, if a loss happens to a freemau’s estate, it is to be borne by’ the testamentary part only, and not out of the whole personal estate, for that his wife and children are in nature of creditors, and shall have two parts in three of what he died possessed of, though his legatees should be thereby defeated of iheir legacies. So in the case of Read v. Duck, Precedents Chan. 409., il was adjudged that, where ihe personal estate was rendered deficient hy the defalcation of the execulor, the deficiency is to be entirely borne by file dead min’s share, as the wife and children are in the nature of creditors to the amount of two thirds of what he died possessed of, and that the loss is to he borne by the legatees.
These ideas are quite new in this country, as applied to the rights of the wife. She is not considered as a creditor, nor can her interest prevail against creditors of even the lowest degree. Losses, such as those just mentioned, are tobe borne by the whole estate ; all of which is a legatory part quoad that purpose ; and she can only come in for a part of the surplus after creditors of every class are satisfied. This is admitted even by Judge Tucker, in the passage before mentioned, as the established law, although, as to negroes, it seems to be his individual opinion that, under the word “ possessed,” she would be entitled to her third in preference to creditors. In the same passage this writer has laboured to put the wife upon the footing of a creditor ; but he admits, at the same time, that hia construction in this particular has not prevailed,
*76 These prominent marks of distinction between the character of the widow’s claim under the custom, and under our laws, make the decisions upon the customs very unsafe and improper guides in the case before us. They are utterly inapplicable. Her right to impeach the conveyance under the custom, is bottomed upon an interest, not admitted to belong to her under our laws, and which would support her under the before mentioned principles of the common law. In this country she has no such interest, until after all creditors, and even voluntary claimants, by grant from the husband in his life time, are first satisfied. To satisfy them, the whole personal estate is to be considered as the legatory partin this country; which is otherwise under the custom of London as aforesaid.
But this is not all; most of the English cases on the custom only set aside such conveyances as are considered in the light of a donatio causa mortis, as quasi a will, and not such as are considered perfect grants. This is conceded by the appellee’s counsel, who have contended that the conveyance before us is in fact a will in disguise. I have been able to find only one or two decisions of a different character, and they have been, perhaps, attended by circumstances not existing in this case. The case of Cowper v. Brown, supposed by one of the judges to be a stronger case than this, in addition to its being a solitary case, by an inferior court also, probably went off on the idea of being a donatio causa mortis ; for the deed and will are stated to have been made on the same day, and therefore as forming, as it were, one transaction. But, in the case before us, the conveyance in question has no ingredient of a testamentary act, or of a donatio causa mortis, when one, moved by the present peril of death, gives and delivers something to another, to be his in case the giver die, or, if he live, to have it again. This gift is compared to a legacy, and it becomes not his presently, but in case the giver die.(a) This gift is ambulatory, and open, ’till the donor’s death, and may be revoked as a will may.(b) But, adds the same author, if one, just before his death, gives goods absolutely, this is not a donatio causa mortis, because it is not revocable.(c)
These criteria entirely exclude the conveyance now in question. \ By it the property was absolutely given by an instrument which is not, revocable. The right of the donees is *77 not to depend upon the event of the donor’s death ; nor was there any trust or confidence that the donor was to have it hack in case he recovered from his illness. Indeed, the grant was not made during a last illness; nor was it moved by a present peril of death, but was only the consummation of a purpose long before settled, as is proved by Mr. Tyler and others. It is, therefore, not a donatio causa mortis, or a testamentary act; if it were, indeed, a will in disguise, as was argued by the appellee's counsel, it could not withstand the justice of this court. It would stand interdicted, as well as an open will, by the positive provisions of the statute.
Considered as a grant, it is of no importance that a remainder only is granted, while the life interest is retained. That remainder is a vested interest, is a real advancement, and may be alienated. In the case of a father having but one negro, he can only provide for his child, in this way, without depriving himself of the present use of that negro altogether, and reducing himself to want. This decides the principle of the case. Again, it is said that the donor did not part with the possession of the property. Two answers occur to this objection : 1st, That the possession of the donor is consistent with the deed of settlement which is recorded ; and 2d, That this possession cannot be objected on the part of the wife. 1st, Because she cannot be supposed to be ignorant of this open and notorious transaction done by her husband ; and 2dly, because she is not a creditor, and could not therefore be defrauded or deceived by a delusive possession. It is held in Ryal v. Rolle, 1 Atk. 197, that possession of goods is no otherwise a badge of fraud than as it is calculated to deceive creditors ; for, as to goods (adds the chancellor,) ! have no way of coming to the knowledge of the owner, but by seeing who is in possession of them. In the case before us, that knowledge was afforded by a recurrence to the records. The separation of the possession from the right, therefore, cannot be objected by any, and much less by the wife, who is no creditor, and must also be supposed conusant of all the transactions of her husband. With respect to what is said by one of the judges, of placing the children under terms in consequence of the legal title of some of the property being in the executors, and not in the trustees; the answer is, that these children are not plaintiffs, and ask nothing from the court, *78 but that the bill be dismissed, and the executors and trustees be permitted to fulfil their trusts: there is no ground for such decree, therefore, existing in this suit.
This view of the subject determines my opinion in the present case. Owing to the particular circumstances involved in it, I may regret the judgment I am obliged to give. I had even strong feelings, on the argument, in favour of the appellees, which had almost overpowered the best convictions of my understanding. I rejoice, however, that I am liberated from my first prejudices, and that 1 shall not now» give a decision, which would afford a precedent in other cases, exalting the claim of the wife beyond its proper level, and abridging the heretofore admitted right of the husband over his personal property. I shall not, even in this strong case, lay the foundation of a superstructure, the consequences of which 1 am unable to foresee or estimate. My opinion is, that the deeds in question be decreed to be valid; and that the decree be reversed so far as it holds the contrary, and the wife be let into all her legal rights, excluding those passed by the deeds in question. I concur in the particulars of the decree to be exhibited by the president.
Judge Fleming. This cause seems to me important, rather from the magnitude of the subject in controversy, than from any difficulty in the principles on which it should be decided ; which, I conceive ought to be by the laws of our own country, without regard to the customs of any foreign country or city whatever, unless they perfectly coincide with the principles, laws, and usages of our own.
Two points only appear to me material to be considered, 1st, whether a marriage agreement, or promise, on the part of Lightfoot, as charged in the bill, or any other, be proved ?— and 2dly, whether, if not, he bad a right to dispose of his personal estate in any manner he thought proper in his own life time.
With respect to the first point, I consider the boastings of Lightfoot, that he was worth ] 80,000l., mentioned in one of the depositions, a mere gasconade, or idle talk, not affecting the present question, and the only evidence of a marriage promise that appears in the record, is the deposition of John H. Boswell, who says that, “ some few weeks before the marriage» *79 he heard the said IVm. Lighlfoot tell the said Ann Clopion « Ellison that, if she would marry him, he would give her a jointure of 40,00()Z. ; besides which sum, iu case he died “ first, she should be entitled to one third part of his personal “ estate.” — The latter (after debts, funeral charges, &c. paid,) the law would have given her, without any promise whatever.
But the deposition of Boswell, so far as it goes to prove the promise of a jointure, is inadmissible evidence, if we pay respect to our statute of frauds and perjuries, which was intended to guard against the very evil and mischief which now appears before the court. And I consider myself as much bound by that statute as by any one in our whole code of laws ; as I can discover nothing in the record to take this case out of the operation of it. But admitting for a moment, that, the promise of a jointure had been legally proved, the appellees must either give up the claim, or rely upon if altogether ; for it is a well settled principle that, by our laws a widow shall not have both jointure and dower ; though, in some cases, she has an election to take which of the two she may think most for her benefit. In regard to the second point, whether Lighlfoot had a right to dispose of his personal estate in any manner he thought proper, during his own life time, I have no doubt; as no marriage agreement or promise has been proved, to give his widow a lien on that part of the estate. — It is admitted that, it appears from the evidence, one motive for his conduct was to deprive his wife (with whom he had for some time lived unhappily,) of dower in a great portion of his personal estate ; but whether or not, his motives for such conduct comported with the strict rules of morality, is not for me to decide; but it is worthy of remark, that his large gifts of personal property after his second marriage stated in the record, were not to defraud creditors but they were to advance h; life his own offspring, by a former venter, three of whom were married and had issue; and for whom he had, previously, made but a slight provision ; and therefore he was naturally and morally bound to provide for them ; the measure of which provision was altogether within his own breast, so furas it respected his personal estate : and should this court interfere with, and control such his undoubted right and privilege, it would, in my apprehension, be makings very injudicious and dangerous *80 precedent; and one of the worst that a court can devise, fop disturbing the peace and quiet of families; the evils of which are beyond my powers of calculation. I am therefore of opinion, that so much of the said decree of the superior court of chancery, for the district of Williamsburg, as sets aside the deed of trust of the 21st of April, and the several subsequent deeds of May 1809, as fraudulent; and also, so much of the after part of the said decree as is consequent thereon, is erroneous, and ought to be reversed ; and the residue of the said decree affirmed. And that is the opinion of a majority of the court.
The following was pronounced as the court’s opinion :—
The Court is of opinion that, although, in a controversy between creditors of the grantor William high (foot, in the proceedings mentioned, and the appellants his children claiming the slaves and personal estate novr in controversy by voluntary conveyance from the said William Lighifoot their father, the said conveyances might, under the circumstances disclosed in this case, be held to be fraudulent as to them ; — yet that, in this case, of a controversy between the children of the said William Lightfoot, not shown to be otherwise provided for, and his widow, who is entitled to a large dower in his real estate, besides her share in his personal estate unconveyed by those deeds, the court has no power to set aside the said deeds ; — both because of the meritorious claims of the children, as aforesaid ; because the widow has no claim of interest in the property, conveyed by the deeds aforesaid, which will let her in to impeach the same ; and because there is no principle, authorizing this court to interfere in this case, which would not equallyjustify it in setting aside a deed, as fraudulent, made in favour of children otherwise unprovided for, on the ground of its being voluntary. — The court is farther of opinion that, although the widow of a person dying seized of real or personal estate has a legal, equitable and moral right to a provision from his estate after his death, yet that this claim does not extend to the whole thereof, — must be limited and defined by law as to the extent and quality thereof. — and be in subordination to the claims' of creditors, and others, to whom a preference is given by the positive provisions of the statutes, *81 Acting under the influence of these principles, the court is of opinion, that in the case before us, when the female appellee renounced the will of her husband, she was only entitled to dower in the slaves of which her husband died possessed, and to such a part of his other personal estate as she would have been entitled to, had her husband died intestate, and is not entitled to disturb the conveyances now in question, because of her want of interest as aforesaid. In making this decision the court considers the conveyances aforesaid as absolute and irrevocable deeds, and not, as was argued, wills in disguise, which this court would not permit to elude the just claims of the wife as provided for by statute.
The court is farther of opinion that this case cannot be at all influenced by decisions upon the custom of London, (which were so much pressed in the argument 5) — among other reasons, because that custom has given to the claims of the wife and children arising under it a dignity not belonging to that of the wife, claiming independently of the will, in this country ; and because, while the cases on the custom, which were cited, are, on this ground, wholly inapplicable, they are also inapplicable so far as they apply to the deeds annulled and set aside thereby in England ; for those deeds had a resemblance to a testament, or, at least, to the testamentary disposition called a donatio causa mortis, to which the deeds now before ns bear no similitude; the same being neither ambulatory and revocable, made in present peril of death, nor under a confidence that the property would be restored if the donor recovered from a present illness, but being conclusive deeds máde in pursuance of a determination, long previously formed, to grant the property to his children.
The court is farther of opinion that, while the English eases, made upon a different law, are inapplicable as aforesaid, it ought not to be bound by the decisions of any of the subordinate tribunals in this country, (if there be any adverse to the opinion now declared,) because it is the province of this court to correct the errors of those tribunals when committed, and not to follow them because they have taken place -and the most that could be contended for on this point would be, that this court, in a doubtful case, would be governed by a long series of decisions which have grown into a rale of pro *82 perfy, and, being universally submitted to, would carry with them evidenced' general assent and acquiescence ; — nothing of which appears in the case before us.
Acting under the influence of these, among other reasons, the court condemns of error, and reverses so much of the decree before us as sets aside, in favour of the female’appellee, the deeds of April 2]st, 1809, and the deeds of May, 1809, in favour of the defendants George Blakey, William H. Idghifoot, and Anne'C. Lightfoot, and as gives to the said appeüee a part of the slaves and other estate thereby conveyed; — and also so much of the said decree as directs an account to be rendered of and concerning the slaves and other estate conveyed by the said deeds, and decrees in favour of the appellees (he payment of the hires or profits thereof. The decree is to be reversed, so far as it conflicts with the opinion and decree now pronounced, vsith costs, and affirmed as to the residue : — and the cause is to be remanded, to be finally proceeded in pursuant to the principles of this decree.

 2 Vern, 612.

 2 Vern. 277.

 2. Atk. 62.

 Ibid. 377.

4) 2. Vez. 591.

 1 Font. ch. 4. sect. 11.

 1 Atk. 63, Metcalfe, &c. v. Metcalfe, &c.

 See this statute in 2 Eq. cases abr. 278.

 See a case under a contract of this hind, Lucas v. Lucas, 1 Atk. 270.

 Fonb. Bk. 1, ch. 4 § 16. n. p.

 2 Atk. 160

 2 Vern, 202.

а) 2 Vern. 612.

6) 7 Viner.

 3 Atk. 676.

 2 Vezey, sen. 591.

 3 Bac. 307, and 3 Co. Rep. 83. Twine’s case.

 Ibid.

 3 Co. 83.

 2 Tuck. Bl. appx. p. 86.

 3 H & M. 340.

 4 H. & M. 31.

 Swinb.22.

 4 Bac. 336.

 Ibid,